## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| WILLIE JAMES PYE, | * | CIVIL ACTION NO. |
| | * | 3:24-cv-48-TCB |
| PLAINTIFF, | * | |
| v. | * | |
| | * | |
| TYRONE OLIVER, Commissioner, | * | |
| Georgia Dep't of Corrections, | * | |
| | * | |
| CHRISTOPHER M. CARR, in his | * | |
| official capacity as the Attorney | * | |
| General of the State of Georgia, | * | |
| | * | |
| STATE BOARD OF PARDONS | * | |
| AND PAROLES | * | |
| | * | |
| SHAWN EMMONS, Warden, | * | |
| Georgia Diagnostic and | * | |
| Classification Prison, | * | |
| | * | |
| | * | |
| DEFENDANTS. | * | |

## DEFENDANTS' PRE-ANSWER MOTION TO DISMISS AND RESPONSE TO PLAINTIFF'S COMPLAINT

CHRISTOPHER M. CARR  112505
Attorney General

BETH A. BURTON          027500
Deputy Attorney General

SABRINA GRAHAM          305755
Senior Assistant Attorney General

Come now, Defendants Tyrone Oliver, Christopher Carr, Pardons and Paroles, and Shawn Emmons, by and through counsel, Christopher M. Carr, Attorney General for the State of Georgia, and file their Pre-Answer Motion to Dismiss and Response to Plaintiff's Complaint, showing the Court as follows:

## INTRODUCTION

Currently, of the forty-one inmates on Georgia's death row, the State is enjoined from seeking an execution warrant based on the 2021 COVID-19 agreement entered between the Georgia Attorney General's Office and the Georgia capital defense bar. *See State of Ga. v. Fed. Def. Program, Inc.*, 315 Ga. 319, 319 (2022). The COVID-19 agreement excludes Pye as a party because the denial of his rehearing in the Eleventh Circuit occurred nearly two years after the Statewide Judicial Emergency ended in June of 2021. *See* Doc. 1-1 at 4-5; *Fed. Def. Program, Inc.*, 315 Ga. at 344 n.17. Indeed, Pye did not seek to become a party to the ongoing 2021 litigation regarding the COVID-19 agreement until the day before the Spalding County District Attorney obtained his execution order. *See* Def. Att. C. His request to intervene in that action was denied by the Fulton County Superior Court based on the plain language of the agreement and the Georgia Supreme Court's holding that inmates that do not meet the requirements of the COVID-19 agreement are not a party to it. *See* Def. Att. C.

Pye now argues to this Court that the State's decision to obtain his execution order violates his rights under the Equal Protection Clause because the State is unable to obtain execution orders for the seven inmates covered by the COVID-19 agreement.  But to succeed on the merits of his "class of one" equal protection claim Pye must show he is "similarly situated" in all material respects to the seven other inmates and the government had no "rational basis" for obtaining his execution warrant.  *See Chabad Chayil, Inc. v. Sch. Bd. of Miami-Dade Cty.*, 48 F.4th 1222, 1233 (11th Cir. 2022).  In the simplest terms, Pye fails to make either showing because he is clearly not a party to the COVID-19 agreement and the State has the right to enforce lawful sentences of death after an inmate has exhausted all appeals.  And, as Pye is the only death-eligible inmate currently on death row, the State's decision to obtain an execution warrant can hardly be called arbitrary.

Pye's due process claim is also without merit.  He argues that the COVID-19 agreement created new clemency procedures for death row inmates.  It did not.  There is no constitutional right to clemency and only "minimal" due process rights.  *Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 289 (1998).  Pye has known since March of last year when the Eleventh Circuit denied his rehearing request that his execution was imminent, and he knew in October of 2023 when the Supreme Court denied his final petition for certiorari review, that he had exhausted his appeals.  *See* Def. Att. A; *Pye v. Emmons*, 144 S. Ct. 344 (2023).  He fails to plead any facts showing that he

was precluded by any State mechanism that kept him from preparing for his clemency proceeding.

Accordingly, Pye's complaint should be dismissed for failure to state a claim and his request for stay of his execution should be denied.

## STATEMENT

### A.  Facts of the Crimes

On November 16, 1993, Petitioner James Willie Pye, along with Chester Adams and Anthony Freeman, robbed, kidnapped, gang-raped, and murdered Alicia Lynn Yarbrough with a .22 pistol.  *Pye v. State*, 269 Ga. 779, 780 n.1, 782-783 (1998).  Alicia had been living with the father of her child and boyfriend, Charles Puckett, though she had previously been in a "sporadic romantic relationship" with Pye.  *Id.* at 782.  Puckett had signed the birth certificate of the child whom Pye claimed as his own.  *Id.*  This angered Pye.  Meanwhile, Pye also heard that Puckett had recently collected a settlement check from a lawsuit.  *Id.*  Motivated by anger and greed, Pye set out to rob Puckett with Adams and Freeman.  *Id.*

The three men drove to Griffin in Adams's car where "Pye bought a large, distinctive .22 pistol" "in a street transaction."  *Id.*  They then went to a party where a guest saw Pye with the gun.  *Id.*  Around midnight, Pye told the other two men, "it's time, let's do it," and they left the party and drove toward Puckett's home.  *Id.*  Upon arriving, "all of the men put on the ski masks which Pye had brought with him"; Pye and Adams additionally wore

gloves.  *Id.*  They exited the vehicle and "approached Puckett's house on foot."
*Id.*  Puckett was not there but Alicia was home alone with her infant child.
*Id.*  "Pye tried to open a window and [Alicia] saw him and screamed."  *Id.*
"Pye ran around to the front door, kicked it in, and held [Alicia] at gunpoint."
*Id.*  "[T]here was no money in the house."  *Id.*  Still, the men took a ring and
necklace from Alicia, kidnapped her, and left the baby home alone.  *Id.*

 "The men drove to a nearby motel where Pye rented a room using an
alias."  *Id.*  There, they all took turns raping Alicia at gunpoint during which
time Pye also angrily exclaimed that "[Alicia] let Puckett sign [his] baby's
birth certificate."  *Id.*  "After attempting to eliminate their fingerprints from
the motel room, the three men and [Alicia] left in Adams'[s] car."  *Id.*  "Pye
whispered [something] in Adams'[s] ear and Adams turned off onto a dirt
road."  *Id.*  Pye ordered Alicia out of the car, made her lie face down, and shot
her three times, killing her."  *Id.*  "Pye tossed the gloves, masks," and .22
pistol from the car as they drove away.  *Id.*

 A few hours after she was killed, the police found Alicia's body and
recovered the tossed items.  *Id.* at 783.  "A hair found on one of the masks
was consistent with [Alicia's] hair, and a ballistics expert determined that
there was a 90 percent probability that a bullet found in [Alicia's] body had
been fired by the .22."  *Id.*  Semen was also found in Alicia's body and "DNA
taken from the semen matched Pye's DNA."  *Id.*  Later that day, Pye told the
police that "he had not seen [Alicia] in the last two weeks."  *Id.*  However,
Freeman later confessed to the crimes as outlined above.  *Id.*

**B.  Trial Proceedings**

On February 7, 1994, Pye was indicted by a Spalding County grand jury for malice murder, felony murder, kidnapping with bodily injury, armed robbery, burglary, rape, and aggravated sodomy.  *Id.* at 780 n.1  Pye's trial began on May 28, 1996 and on June 6, 1996, the jury found him guilty on all counts of the indictment except felony murder and aggravated sodomy.  *Id.* Following the sentencing phase of trial, on June 7, 1996, the jury recommended a death sentence for the malice murder, "finding as four separate statutory aggravating circumstances."  *Id.* at 779-780, 780 n.1.  The trial court ordered the death sentence for the malice murder. *Id.* at 780 n.1. For the remaining counts, it "imposed three additional life sentences plus twenty years," all to be served consecutively.  *Id.*

On September 21, 1998, the Georgia Supreme Court affirmed all of Pye's convictions and sentences.  *Id.* at 789; *cert. denied Pye v. Georgia*, 526 U.S. 1118 (1999).

**C.  State Habeas Proceedings**

Pye filed his state habeas petition on February 4, 2000.  On January 30, 2012, the state habeas court issued an order denying Pye's petition.  The Georgia Supreme Court denied Pye's application for a certificate of probable cause to appeal the state habeas court's order.  Pye did not file a petition for writ of certiorari review in the Supreme Court.

### D.  Federal Habeas Proceedings

Pye filed his federal habeas petition on July 24, 2013.  This Court denied relief for Pye's claims on January 22, 2018.  Pye appealed to the Eleventh Circuit Court of Appeals and a panel of the Court granted Pye federal habeas relief on his sentencing phase ineffective-assistance claim on April 27, 2021. *See Pye v. Warden, Ga. Diagnostic Prison*, 853 F. App'x 548 (11th Cir. 2021). The Warden petitioned for rehearing en banc, and the Court vacated the panel opinion and granted the request on September 1, 2021.  *Pye v. Warden*, 9 F.4th 1372 (11th Cir. 2021).  The en banc Court affirmed this Court's decision on October 4, 2022 and remanded to the panel for consideration of an outstanding claim.  *Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1030 (11th Cir. 2022).  The panel denied relief, and the Eleventh Circuit denied Pye's final petition for rehearing on March 9, 2023.  *Pye v. Warden*, No. 18-12147, 2023 U.S. App. LEXIS 1897 (11th Cir. Jan. 25, 2023); Def. Att. A.  The Supreme Court denied certiorari review on October 30, 2023.  *Pye v. Emmons*, 144 S. Ct. 344 (2023).

### E.  Execution Warrant

On February 29, 2024, the Griffin County Judicial Circuit District Attorney obtained an order setting Pye's execution for March 20, 2024.  Def. Att. B.  Pursuant to OCGA § 17-10-40 (b) the "time period for the execution fixed by the judge shall commence not less than ten nor more than 20 days from the date of the order."  Pye was given the full 20 days under the statute. *See* Def. Att. B.

### F.  Fulton County Civil Proceedings

One day prior to the State of Georgia obtaining the execution warrant, on February 28, 2024, Pye moved to intervene in an underlying breach of contract action between the Federal Defender and Defendants (the "Federal Defender Action").[1]  *See* Def. Att. C.  This case concerned a COVID-19 agreement between the Attorney General's Office and the defense bar that represents all death row inmates.  Briefly, in early 2021, the Attorney General and the capital defense bar negotiated ways to handle executions during the COVID-19 pandemic.  In general terms, the Attorney General agreed to postpone executions until the judicial emergency was lifted, COVID-19 vaccines were available, and visitation restrictions for death-eligible inmates were lifted.  *See* Doc. 1-1 at 4.  The agreement, however, applied only to a limited subset of death-eligible prisoners: "This agreement applies only to death-sentenced prisoners whose petition for rehearing or rehearing en banc was denied by the Eleventh Circuit while the State of Georgia remained under judicial emergency order. . . ." *Id.* at 5-6.

On March 4, 2024, the Fulton County Superior Court denied Pye's motion to intervene on the ground that "between the plain language of the agreement itself and the Supreme Court's opinion, this Court must agree with Defendants' position that the agreement 'applies only to those inmates whose petition for rehearing or rehearing en banc was denied by the Eleventh

---

[1] That case is styled *Federal Defender Program, Inc. et al. v. State of Georgia et al.*, Civil Action Number 2022CV364429.

Circuit before June 30, 2021.'"  Def. Att. C.  Pye obtained a certificate of immediate review to appeal the court's denial of his motion to intervene and filed his appeal on March 12, 2024.  *See* Def. Att. D.

On March 5, 2024, Pye filed a complaint in the Superior Court of Fulton County alleging he was a third-party beneficiary the above-mentioned agreement between Defendants and the Federal Defender Program, Inc.  *See* Def. Att. E.  On March 13, 2024, the court granted the Defendants motion to dismiss the complaint.  *See* Def. Att. H.

### G.  Current 42 U.S.C. § 1983 Proceeding

Pye filed his current complaint alleging a violation of his equal protection and due process rights on March 11, 2024.  *See* Doc. 1.  This response follows.

## ARGUMENT AND CITATION OF AUTHORITY

### I.  Failure to Exhaust Administrative Remedies

The Prison Litigation Reform Act of 1995 (PLRA or Act)[2] requires an inmate to exhaust all available administrative remedies before filing suit. The Act provides:

> No action shall be brought with respect to prison conditions under Section 1979 of the revised statutes of the United States, 42 U.S.C. § 1983, or any other federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

---

[2] Title VIII of the Omnibus Consolidated Rescissions and Appropriations Act of 1996, PL 104-134, 110 Stat 1321.

42 U.S.C. § 1997e(a).

Thus, "'when a state provides a grievance procedure for its prisoners, as Georgia does here, an inmate alleging harm suffered from prison conditions must file a grievance and exhaust the remedies available under that procedure before pursuing a § 1983 lawsuit.'" *Johnson v. Meadows*, 418 F.3d 1152, 1156 (11th Cir. 2005) (quoting *Brown v. Sikes*, 212 F.3d 1205, 1207 (11th Cir. 2000)). Further, what is required is "proper exhaustion," meaning actual compliance with the procedural rules and deadlines as set forth in the applicable state grievance system. *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). This means that a prisoner must use all of the administrative options that the state offers and take each step in the administrative process, *see Bryant v. Rich*, 530 F.3d 1368, 1378 (11th Cir. 2008); *cf. Johnson*, 418 F.3d at 1158 (discussing *Pozo v. McCaughtry*, 286 F.3d 1022, 1023 (7th Cir. 2002)); and also that the prisoner must file his complaints and appeals in the time and the place required by the prison rules. *Johnson,* 418 F.3d at 1158-1159 (untimely grievance does not satisfy PLRA exhaustion requirement).

Exhaustion is mandatory under the PLRA, and unexhausted claims cannot be brought in court. *Jones v. Bock*, 549 U.S. 199, 211 (2007) (citing *Porter v. Nussle*, 534 U.S. 516, 524(2002)). "Requiring exhaustion allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court." *Jones*, 549 U.S. at 204; *see also Johnson*, 418 F.3d at 1155 ("Congress intended to afford prison officials time to address grievances internally before allowing a prisoner to

initiate a federal lawsuit."). Claims that are not exhausted must be dismissed. *Harper v. Jenkin*, 179 F.3d 1311, 1312 (11th Cir. 1999) (*per curiam*); *Alexander v. Hawk*, 159 F.3d 1321, 1328 (11th Cir. 1998).

### A. The Court may consider materials outside the pleadings and may resolve factual disputes when deciding the exhaustion issue.

Defendants are submitting with this motion documents that establish Pye's failure to exhaust administrative remedies for his claim before filing this lawsuit. For the reasons discussed below, this Court may consider these materials without converting this motion to one for summary judgment.

Exhaustion is not a jurisdictional requirement, *Woodford*, 548 U.S. at 101, and instead is an affirmative defense. *Jones*, 549 U.S. at 216. However, the Eleventh Circuit has described exhaustion as similar to a jurisdictional defense in that it "is a matter of abatement, and ordinarily does not deal with the merits." *Bryant v. Rich*, 530 F.3d 1368, 1374 (11th Cir. 2008) (quotations and citations omitted). Thus, exhaustion is properly addressed in a motion to dismiss rather than a motion for summary judgment. *Id.* at 1374-76. When ruling on the exhaustion issue in a motion to dismiss, the trial court may consider facts outside the pleadings and resolve factual disputes so long as such disputes do not decide the merits. *Id.* at 1376-77.

In *Turner v. Burnside*, 541 F.3d 1077 (11th Cir. 2008), the Eleventh Circuit laid out a two-tier approach for a trial court examining the issue of exhaustion of administrative remedies. At the first tier the court is to take

the plaintiff's version of the facts regarding exhaustion as true.  *Id.* at 1082.
If the plaintiff has not exhausted under his own version of the facts, then the
complaint must be dismissed.  *Id.*  If the complaint is not subject to dismissal
at the first step, the court moves to the second tier where it no longer must
accept the plaintiff's facts as true.  *Id.*  Rather, "the court then proceeds to
make specific findings in order to resolve the disputed factual issues …." *Id.*
"Once the court makes findings on the disputed issues of fact, it then decides
whether under those findings the prisoner has exhausted his available
administrative remedies."  *Id.* at 1083.

Here, the complaint is void of any reference to Pye's mandatory
obligation to exhaust.  *See generally* Doc. 1.  As Pye fails to make any
assertion with respect to exhaustion, this Court is precluded from finding a
failure to exhaust at *Turner's* step one.  *Jones v. Bock*, 549 U.S. 199, 216
(2007) ("failure to exhaust is an affirmative defense under the PLRA, and []
inmates are not required to specially plead or demonstrate exhaustion in
their complaints.").  However, the Court should determine that the case is
subject to dismissal at *Turner's* step two.  At step two the Court is permitted
to make fact findings on the question of whether Pye exhausted
administrative remedies.  Moving to the second tier of *Turner*, as explained
below, Defendants have provided evidence that Pye failed to file a grievance
under the available prison grievance process for his claim in this case.
Because he failed to exhaust the available administrative remedy for his
claims before filing this lawsuit his claim must be dismissed.

### B.    The Department of Corrections' Grievance Process

Attachment F to this brief is the Affidavit of Jamie Bethune, who is the Grievance Coordinator at GDCP.  The affidavit outlines the grievance process that is applicable to and utilized for inmates committed to the GDCP.  Def. Att. F, ¶¶ 2-3 and Ex. 1; *see also id.* at ¶¶ 3-14.  The process as outlined includes two steps, to be followed and completed by the prisoner sequentially: Step One: Original Grievance; and Step Two: Central Office Appeal.  *See id.* at ¶¶ 3-14.

### C.    Pye has failed to exhaust his administrative remedies.

The Grievance SOP permits grievances to be filed on the subject matter of the claims in this case.  Specifically, as Bethune's affidavit shows, with the exception of certain matters that are designated in the Grievance SOP as "Non-Grievable Issues," the Grievance SOP is applicable to "any condition, policy, procedure, or action or lack thereof that personally affects the offender."  Def. Att. F, ¶ 5.  The Grievance SOP also provides that "housing assignments, program assignments, security classifications or work assignments" are non-grievable issues "unless there is an alleged threat to the inmate's health or safety."  *Id.* at ¶ 5.  Such threats are grievable under the policy.  *Id.*  The policy also allows an inmate to file a grievance alleging retaliation or harassment, regardless of the form of the alleged retaliation or harassment.  *Id.*

The Grievance SOP permitted Pye to submit a grievance concerning the subject matter of his claims, but he did not do so. Rather, as the Bethune

declaration shows, he has filed two grievances at GDCP, Grievance No. 284443, which he submitted on February 20, 2019, and Grievance 101284, which he submitted October 18, 2011.  Def. Att. F., ¶¶ 12-13 and Exs. 2, 3, 4.  In Grievance 284443, Plaintiff complained of not receiving certain emails and photographs.  *See id.*  Grievance 284443 was rejected on March 27, 2019.  *See id.*  In Grievance 101284, Plaintiff complained that he was missing fourteen stamps after an institutional shakedown.  *See id.*  Grievance 101284 was fully granted on November 3, 2011.  *See id.*  So, the grievances that Pye filed at GDCP clearly did not relate to the claims he now asserts in this case.

Again, under the law what is required is "proper exhaustion," meaning actual compliance with the procedural rules and deadlines as set forth in the applicable state grievance system.  *Woodford*, 548 U.S. at 93.  This means that a prisoner must use all of the administrative options that the state offers and take each step in the administrative process, *see Bryant*, 530 F.3d at 1378, and also that the prisoner must comply with the timing and other requirements of the prison rules.  *Johnson,* 418 F.3d at 1158-1159 (untimely grievance does not satisfy PLRA exhaustion requirement).  As shown by the above-described evidence, Pye did not do that for any of his claims in this case.

The law is clear that, in order to effectuate Congress' intent that prison officials be permitted to address inmate complaints before a lawsuit is filed, the PLRA exhaustion requirement is absolute and non-complying claims must be dismissed.  *See Jones*, 549 U.S. at 204, 211; *Johnson*, 418 F.3d at

115.  Pye has failed to exhaust administrative remedies for his claims and therefore his claims must be dismissed.  *See Woodford*, 548 U.S. at 90-91, 93; *see also Smith v. Terry*, 2012 U.S. App. LEXIS 20352, **6 (11th Cir. Sept. 28, 2012) ("Because Smith failed to exhaust his administrative remedies before he 'brought' his section 1983 suit, dismissal was proper."); *accord Morgan v. Ivey*, 2013 U.S. Dist. LEXIS 156758, *2-3 (M.D. Ga. Nov. 1, 2013) (Treadwell, J.) ("A prisoner must take each required step within the administrative process *before* filing a complaint in federal court.") (emphasis in original).

For the reasons stated, Pye's claims and this lawsuit should be dismissed for failure to exhaust administrative remedies as required by the PLRA

## II.  Pye's Complaint Fails to State a Plausible Claim for Relief

Pye's entire complaint should also be dismissed because he fails to state a plausible claim for relief.  Pye's claims are wholly speculative and conclusory and should be dismissed under Federal Rules of Civil Procedure 8 and 12(b)(6).

The Eleventh Circuit has laid out the standard for a motion to dismiss:

A plaintiff may survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6) if the factual allegations in the Complaint give rise to a plausible claim for relief. For a claim to be plausible, the supporting factual matter must establish more than a mere possibility that the plaintiff is entitled to relief. In determining whether a plaintiff has met this burden, the Court must assume all of the factual allegations in the Complaint to be true. The Court, however, need not accept as true any legal conclusions found in the Complaint.

*Gissendaner v. Comm'r, Ga. Dep't of Corr.*, 803 F.3d 565, 571 (II) (11th Cir. 2015).

To satisfy the plausibility requirement, Pye must plead enough facts to state a claim for relief that is plausible on its face. *Id.* at 568. Under Rule 8, there must be more than a "sheer possibility" that Pye's allegations are true. *Id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A plaintiff cannot rely on naked assertions devoid of further factual enhancement. *Id.* Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief. *Iqbal*, 556 U.S. at 678. The complaint "must include enough facts to raise a right to relief above the speculative level." *Boyd v. Warden, Holman Corr. Facility*, 856 F.3d 853, 864 (11th Cir. 2017). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.'" *Bell Atlantic Corp. V. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted); *see also Boyd*, 856 F.3d at 864.

To determine whether an action fails to state a claim upon which relief can be granted, this Court must engage in a two-step inquiry. First, this Court "should eliminate any allegations in the complaint that are merely legal conclusions." *Id.* Second, "where there are well-pleaded factual allegations, [this Court should] assume their veracity and then determine

whether they plausibly give rise to an entitlement to relief." *Id.* This is a context-specific task that requires this Court to draw on its judicial experience and common sense. *Iqbal*, 556 U.S. at 680.

### A.   Pye fails to state an equal protection claim.

Pye argues that he is being treated "disparately from all other death sentenced prisoners who have completed their post-conviction review"—i.e., the death sentenced prisoners who are covered by the COVID-19 agreement. Pye is incorrect.

### 1.   Pye's claim falls under the "class of one" equal protection standard of review.

Pye erroneously applies the general equal protection standard, instead of the "class of one" standard.  *See* Doc. 1.  Because Pye is not part of a protected class and is asserting that he is the only individual that is being treated differently than the death row inmates who the State is enjoined from seeking an execution warrant, he has pled a "class of one" equal protection claim.  *See Chabad Chayil, Inc. v. Sch. Bd. of Miami-Dade Cty.*, 48 F.4th 1222, 1233 (11th Cir. 2022) ("In a 'class of one' claim, a plaintiff alleges not that it belongs to a protected class, but that it is the only entity being treated differently from all other similarly situated entities."); *Griffin Indus. v. Irvin*, 496 F.3d 1189, 1200 (11th Cir. 2007) (explaining that because the Plaintiff did not fall into a protected class, the equal protection claim fell under the fairly new category of "class of one" claims "first expressly recognized by the Supreme Court in *Village of Willowbrook v. Olech*, 528 U.S. 562, 120 S. Ct.

1073, 145 L. Ed. 2d 1060 (2000) (per curiam)"); *see also Miller v. Comm'r, Ala. Dep't of Corr.*, No. 22-13136, 2022 U.S. App. LEXIS 26689, at *11-12 (11th Cir. Sep. 22, 2022) (recognizing Miller's claim that he was being treated differently than other inmates who had elected nitrogen hypoxia as a method of execution because he had also elected this method as a "class of one" equal protection claim).

To prevail on a 'class of one' equal protection claim, 'a plaintiff must show that it 'has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" *Chabad Chayil, Inc.*, 48 F.4th at 1233 (11th Cir. 2022) (quoting *PBT Real Est., LLC v. Town of Palm Beach*, 988 F.3d 1274, 1285 (11th Cir. 2021)). The "similarly situated requirement" is applied "'with rigor'" and the "entities being compared 'must be prima facie identical in all relevant respects.'" *Id.* (quoting *Griffin Indus.*, 496 F.3d at 1207; *PBT Real Est.*, 988 F.3d at 1285). "A plaintiff must ultimately show that it and any comparators are 'similarly situated in light of all the factors that would be relevant to an objectively reasonable governmental decisionmaker.'" *Id.* (quoting *Douglas Asphalt Co. v. Qore, Inc.*, 541 F.3d 1269, 1275 (11th Cir. 2008) (quotation mark omitted). In other words, "[f]or a multi-dimensional action, the similarly situated comparators 'must be prima facie identical in all relevant aspects.'" *Miller*, 2022 U.S. App. LEXIS 26689, at *11 (quoting *Campbell v. Rainbow City*, 434 F.3d 1306, 1314 (11th Cir. 2006).

### 2.   Pye is not "similarly situated" in "all material respects "to his comparators.

Pye fails to show he is "similarly situated" in all "material respects" to his comparators—i.e., the death row inmates that are a party to the COVID-19 agreement.  Pye's only allegation that he is "similarly situated" is that the inmates covered by the COVID-19 agreement are also death eligible like him. But they are not death eligible because the State of Georgia is enjoined from seeking an execution warrant for any of these inmates.  *See State of Ga. v. Fed. Def. Program, Inc.*, 315 Ga. 319, 319 (2022).

Second, and perhaps most important, Pye is excluded as a party to the COVID-19 agreement by the plain terms of the agreement as found by not only the Fulton County Superior Court but also the Georgia Supreme Court. As stated *supra*, the agreement only applies to a limited subset of death-eligible prisoners: "This agreement applies only to death-sentenced prisoners whose petition for rehearing or rehearing en banc was denied by the Eleventh Circuit while the State of Georgia remained under judicial emergency order. . . ."  Doc. 1-1 at 4-5.

On appeal from the injunction issued in 2021 based on the agreement, the State argued that if the three conditions in the agreement were never satisfied, then executions in Georgia could be halted forever in the State.  The Georgia Supreme Court called this argument "overstated" because any relief under the agreement was limited to those death-eligible inmates "*whose petitions for rehearing before the Eleventh Circuit were denied during the*

*statewide judicial emergency*." *Fed. Def. Program, Inc.*, 315 Ga. at 344 n.17

(emphasis added).  When Pye filed his motion to intervene in the Federal

Defender Action regarding the COVID-19 agreement, the state court denied

the motion because "between the plain language of the agreement itself and

the Supreme Court's opinion, this Court must agree with Defendants'

position that the agreement 'applies only to those inmates whose petition for

rehearing or rehearing *en banc* was denied by the Eleventh Circuit before

June 30, 2021.'"  Def. Att. C.  And when Pye filed his complaint alleging he

was a third party beneficiary to the COVID-19, the court disagreed and

dismissed his complaint and denied his emergency motion for interlocutory

injunction and temporary restraining order.  *See* Def. Att. H at 4-7.  As Pye

acknowledges, his "petition for panel rehearing in the Eleventh Circuit Court

of Appeals was denied on March 9, 2023," which was nearly two years after

the expiration of the statewide judicial emergency."[3]  Doc. 1 at 24, n.9.

    Because the Georgia Supreme Court has already determined that those

who do not meet the conditions of the COVID-19 agreement are not a party to

the agreement, this Court is bound by that decision. *See Winn-Dixie Stores,

Inc. v. Dolgencorp, LLC*, 881 F.3d 835, 848 (11th Cir. 2018) ("State law is

what the state appellate courts say it is, and we are bound to apply a decision

of a state appellate court about state law even if we think that decision is

---

[3] The judicial emergency expired on June 30, 2021.  (Fifteenth Order
Extending Declaration of Statewide Judicial Emergency, available at
https://www.gasupreme.us/wp-content/uploads/2021/06/15th-SJEO_as-
issued.pdf.

wrong."). Thus, this Court is precluded from finding Pye is "similarly situated" to his comparators because the Georgia Supreme Cour has already determined that he is not a party to the COVID-19 agreement.

Pye is also not "similarly situated" because the reasons for including the inmates in the COVID-19 agreement do not apply to him. At the time the COVID-19 agreement was entered into by the parties, seven death row inmates had their requests for rehearing denied by the Eleventh Circuit Court of Appeals. *See* Def. Att. G; Def. Att. K. The other two inmates had their rehearings denied before the Judicial Emergency ended. *id.* During negotiations, and at the time of the agreement, Pye's case was pending a final decision by the Eleventh Circuit Court of Appeals. *See Pye v. Warden, Ga. Diagnostic Prison*, 853 F. App'x 548 (11th Cir. 2021). As stated in Pye's complaint, and as explained by Pye's counsel at the time of the COVID-19 agreement, Jill Benton, the reason for the negotiations was due to the fact that there were several inmates that were going to be death eligible during the COVID-19 judicial emergency and counsel did not think they would be able to adequately prepare for a clemency hearing. *See* Doc. 1 at 10-14; Def. Att. I. Pye clearly wasn't considered part of that group because the Eleventh Circuit had not decided his appeal yet.

Indeed, the concerns articulated by Pye in his complaint do not actually state that counsel has been unable to prepare for clemency or execution litigation since his request for rehearing was denied in May of 2023 by the Eleventh Circuit. *See generally* Doc. 1. To be clear, the COVID-19 agreement

was not founded on the premise that all death-eligible inmates were entitled to a certain amount of time to prepare for clemency or an execution.  Again, it was created, which can be seen in the plain terms of the agreement, because the defense bar felt precluded from adequately preparing for clemency and executions due to the number of death-eligible inmates and the COVID-19 pandemic and judicial emergency.  *See* Doc. 1-1 at 4-5; *see generally* Def. Att. I.  At the time Pye's rehearing was denied, the State was enjoined from seeking a death warrant for all other death-eligible inmates and there was no COVID-19 judicial emergency or COVID-19 pandemic keeping Pye's counsel from preparing for the inevitable.  So, the two main concerns that prompted the agreement and the conditions of the agreement, multiple death-eligible inmates and a COVID-19 pandemic, did not exist when Pye's rehearing was denied.  Thus, under the reasons that motivated the capital defense bar for seeking the COVID-19 agreement, Pye was not "similarly situated" to the other death row inmates.

"[I]n light of all the factors that would be relevant to an objectively reasonable governmental decisionmaker," Pye has failed to plead sufficient facts that show he is "similarly situated" in "all material respects" to the death row inmates that are a party to the COVID-19 agreement.  *Chabad Chayil, Inc.*, 48 F.4th at 1233.  Therefore, his equal protection claim should be dismissed for failure to properly state a claim.

### 3.   The State has a "rational basis" for obtaining Pye's execution warrant.

Without conceding that Pye is "similarly situated," the State also had a "rational basis" for obtaining Pye's execution warrant and, contrary to Pye's speculation, the State did not arbitrarily choose to obtain his death warrant. In support of his arbitrary argument, Pye contends that the inclusion clause (or exclusion clause depending on how one views it) setting the inmates eligible under the COVID-19 agreement is "arbitrary." *See* Doc. 1 at 22, ¶41. This is untrue. This clause was created based on the concerns articulated by his own counsel during the negotiations between the Georgia Attorney General's Office and the capital defense bar. As stated *supra*, Pye's counsel at the time of these negotiations was Jill Benton, and she was part of the negotiations. She submitted an affidavit in the Federal Defender Action explaining what led to the agreement which belies Pye's arbitrary allegation. As generally stated in Pye's complaint before this Court, Ms. Benton explained in her affidavit that her office, the Federal Defender Program, Inc., prepared for clemency hearings for death row inmates but the "investigation and preparation of any [] clemency case was forestalled on March 14, 2020, when the Governor of Georgia declared a public health emergency." Def. Att. I, ¶ 9; Doc. 1 at 10-14. Counsel was concerned that they would not have time to prepare, given the COVID-19 restrictions, for "multiple warrant-eligible clients." *Id.* at ¶¶ 6-11. Prior to the email that became the "agreement," the Judicial Council's COVID-19 Task Force requested that the Georgia Attorney

General's Office and the defense bar that represented death row inmates

discuss a solution to this issue.  After the parties, to include Ms. Benton, met

via videoconference, counsel from the Georgia Resource Center sent the

parties a proposed Memorandum of Agreement.  *See* Att. I, ¶¶ 18-19; Att. J.

The MOA contained the following language:

> Thereafter, the Attorney General agrees that following an execution
> or grant of clemency to a death-sentenced prisoner, it shall wait no
> less than 30 days before seeking another execution warrant. Again,
> the Attorney General agrees to ask the District Attorney to seek the
> maximum warrant period of 20 days under O.C.G.A. § 17-10-40(b),
> so that there will be a minimum of 50 days separating any two
> scheduled executions. *This provision only applies to death-sentenced
> prisoners whose petition for rehearing or rehearing en banc was
> denied by the United States Court of Appeals for the Eleventh
> Circuit while the State of Georgia remained under judicial
> emergency order.*

Def. Att. J at 5 (emphasis added).  After this email exchange, the Attorney

General's Office sent an email with the proposed terms the Attorney

General's Office would agree to which included the language setting the

parameters for which death row inmates were covered by the agreement.

Other than a couple of requests for clarification, there was no objection voiced

about the proposed agreement.  *See* Doc. 1-1.  Finally, if the agreement had

not set terms on which inmates were included, then all inmates would have

been included which was not consistent with any discussions had with, or

concerns voiced by, the capital defense bar.  *See, e.g.,* Att. I, ¶¶6-11.

Given that Pye was not a party to the Federal Defender Action and was

clearly excluded from the COVID-19 agreement, the State had a rational

basis for obtaining Pye's death warrant because his appeals had been
exhausted and he had a lawful sentence of death.  Pye obtained his death
sentence in June of 1996, which has been stayed pending his direct appeal,
his state habeas proceeding, and his federal habeas proceeding.  *Pye*, 269 Ga.
at 780 n.1.  Once the United States Supreme Court denied his petition for
certiorari review of the Eleventh Circuit's opinion affirming this court's
denial of relief on October 30, 2023, Pye became eligible for a death warrant.
*See Pye v. Emmons*, 144 S. Ct. 344 (2023).

There is no federal or state law that designates when an execution order
must be obtained following the exhaustion of all state and federal appeals.
*See generally* OCGA § 17-10-40(a) (stating that "[w]here the time period for
the execution of any convicted person in a capital case has passed by reason
of a supersedeas incident to appellate review, a stay of execution by the State
Board of Pardons and Paroles, or for any other reason" a warrant may be
issued by the trial court).  The only law regarding the setting of an execution
in Georgia is OCGA § 17-10-40(b), which only sets the timing of when an
execution must be held *after* a warrant is obtained— "not less than ten nor
more than 20 days from the date of the order."  Additionally, the discretion to
seek an execution warrant lies solely within the province of the district
attorney in the county in which the death sentence was obtained because
only "a judge of the superior court of the county where the case was tried

shall have the power and authority to pass an order fixing a new time period for the execution of the original sentence.[4]  OCGA § 17-10-40(a)

Having stated that, the Attorney General's Office does coordinate between the appropriate district attorney's office and the Georgia Department of Corrections regarding when the necessary parties are available—*e.g.,* the medical team and the Georgia Diagnostic and Classification Prison execution team.  But, again, the Attorney General's Office does not have the authority to obtain an execution warrant from the trial court.  *See* O.C.G.A. §§ 45-15-3 (3), (5), 45-15-10.  Thus, the actual date for an execution is not arbitrary but based on several factors that must be attended to by the government before an execution warrant should be sought by the designated district attorney.  However, because the district attorneys have sole authority to seek an execution warrant, they could, and have, obtained execution warrants without consulting the Attorney General's Office or the Department of Corrections.  This is not generally done though because appeals must be exhausted, which are handled in post-conviction exclusively by the Attorney General's Office, and an execution requires coordination of several governmental agencies and their resources over which the district attorneys do not have authority.

---

[4] The duties of the Attorney General's Office are statutorily set and do not include oversight of the District Attorneys or prosecuting murder cases.  *See* O.C.G.A. §§ 45-15-3 (3), (5), 45-15-10.

Regarding Pye, his execution was not arbitrarily chosen by the State of Georgia.  Currently, Pye is the only inmate on death row that is death eligible.  The other death row inmates that have exhausted their appeals are currently protected by the injunction in the Federal Defender Action.  *See* Att. K (list of death row inmates covered by the COVID-19 agreement).  All other death row inmates have pending litigation that would result in a stay of execution should a district attorney seek an execution order.  *See* Att. L (Death Penalty Report).

Moreover, Pye does not cite to any law, federal or state, that dictates the order in which a state must choose to execute death eligible inmates.  Pye argues that choosing to execute him instead of the inmates under the agreement is arbitrary but doesn't explain how it would be arbitrary if those same inmates were not under a stay and the State obtained an execution warrant for him first.  Indeed, that would make no sense.  If there are several inmates that are death eligible in the State of Georgia, and there are no legal parameters for which inmate's execution is set first, then every execution warrant would fall under Pye's arbitrary argument.  None of the cases Pye cites to even suggest this definition of arbitrary is applicable in this arena.  Moreover, Pye may have a "right to life" under the Bill of Rights, but he also has a lawful death sentence, which the State has the right to enforce now that his appeals have been exhausted.  To infringe on the State's right based upon an agreement under which Pye is not a party has no support in the Equal Protection Clause or the Bill of Rights.

Consequently, Pye's arbitrary argument is based on speculation and he provides no support disputing that the State has a rational basis for seeking a warrant against a death-eligible inmate.  Given his failure to properly plead his equal protection claim, it should be dismissed.

## III.  Pye has failed to properly plead his Due Process claim.

Pye also argues that the COVID-19 agreement created a procedure that must be followed in all clemency proceedings in Georgia to comply with due process.  It did not.  Clemency is not a constitutionally protected liberty interest, and the Due Process Clause is not implicated.  Moreover, the COVID-19 agreement was not about all future clemency proceedings but about the capital defense bar having the ability to prepare during the COVID-19 pandemic.

"In this circuit, a § 1983 claim alleging a denial of procedural due process requires proof of three elements: (1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (2003) (citing *Cryder v. Oxendine*, 24 F.3d 175, 177 (11th Cir. 1994)); *see also Miller v. Comm'r, Ala. Dep't of Corr.*, 2022 U.S. App. LEXIS 26689, *6 (11th Cir., Sept. 22, 2022)).  The Supreme Court and the Eleventh Circuit have held that there is no liberty interest in clemency and a very minimal, if any, due process implications in clemency proceedings.

In *Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272 (1998), the Supreme Court held there was no constitutionally protected liberty interest

in clemency proceedings. *Woodard*, 523 U.S. at 280-85. Quoting *Woodard*, the Eleventh Circuit recently found the same, holding, "[w]ith respect to the Due Process Clause's effect on clemency proceedings, the controlling opinion in *Woodard* is clear that the clemency process is only subject to '*minimal procedural safeguards.*'" *Barwick v. Governor of Fla.,* 66 F.4th 896, 903-904 (2023) (quoting *Woodard*, 523 U.S. at 289). "And the only tangible examples of due-process violations that the Supreme Court has set forth include 'truly outrageous ones, such as (1) a scheme whereby a state official flipped a coin to determine whether to grant clemency, or (2) a case where the State arbitrarily denied a prisoner any access to its clemency process.'" *Gissendaner v. Comm'r, Ga. Dep't of Corr*, 794 F.3d 1327, 1331 (2015) (quoting *Woodard*, 523 U.S. at 289). These scenarios are not before this Court.

Relying on *Evitts v. Lucey*, 469 U.S. 387 (1985) and *Griffin v. Illinois*, 351 U.S. 12, 14 (1956), Pye attempts to equate his clemency proceedings with appellate review. He argues that there is no constitutional right to appellate review, but when a state creates an appellate review process, the process must comport with the Due Process Clause. Again, *Woodard* addressed this claim and specifically distinguished appellate review from clemency proceedings. The Court held, "[a]n examination of the function and significance of the discretionary clemency decision at issue here readily shows it is far different from the first appeal of right at issue in *Evitts*." *Woodard*, 523 U.S. at 285. The Court noted that clemency proceedings are

"not part of the trial -- or even of the adjudicatory process;" "do not determine
[] guilt or innocence"; "are not intended [] to enhance the reliability of the
trial process"; are "conducted by the Executive Branch, independent of direct
appeal and collateral relief proceedings"; are "usually discretionary"; and
have "not traditionally "been the business of courts." *Id.*

The Court concluded that "[]p]rocedures mandated under the Due
Process Clause should be consistent with the nature of the governmental
power being invoked. Here, the executive's clemency authority would cease
to be a matter of grace committed to the executive authority if it were
constrained by the sort of procedural requirements that respondent urges."
*Id.* Pye has a lawfully imposed death sentence, the grant of clemency would
be benefit, but if denied, "he is no worse off than he was before." *Id.*

Likewise, in *Connecticut Bd. of Pardons v. Dumschat*, 452 U.S. 458, 465
(1981), the Court held, that "[i]n terms of the Due Process Clause," an
expectation that a sentence will be commuted "is no more substantial than an
inmate's expectation, for example, that he will not be transferred to another
prison; it is simply a unilateral hope. [] A constitutional entitlement cannot
'be created [] merely because a wholly and *expressly* discretionary state
privilege has been granted generously in the past.'"

Moreover, whatever "*minimal* procedural safeguards" that are protected
by the Due Process Clause have been provided here. *Woodard*, 523 U.S. at
289 (O'Connor, J., concurring in part and concurring in the judgment)
(emphasis in original). In *Woodward*, the only clemency procedures were

"three days' notice of his clemency interview, ten days' notice of his hearing, excluded his counsel at the interview, and prohibited evidence at the hearing"—and these "did not violate the Due Process Clause." *Barwick*, 66 F.4th at 902-(citing *Woodard, supra* at 289-90).  Pye has and will receive more than that afforded in *Woodward*.

Here, Pye has known since his rehearing was denied by the Eleventh Circuit in March of 2023 that his execution was more than likely inevitable. And he knew on October 30, 2023, that there was no pending legal action prohibiting the State from seeking an execution warrant.  Additionally, Pye knew that an execution order could not issue more than 20 days prior to his scheduled execution.  *See* OCGA § 17-10-40(b).  And, according to Georgia's Board of Pardons and Paroles' website, once all appeals have been exhausted "the condemned inmate's attorney may petition the Board to grant executive clemency to his or her client."  https://pap.georgia.gov/parole-consideration/parole-process-georgia/reprieves-commutations#:~:text=After%20the%20Board%20has%20heard,five%20members%20of%20the%20Board.  Moreover, the Board issued a Public Notice of Meeting on March 6, 2024, stating it will hold Pye's clemency hearing on March 19, 2024.  Def. Att. M.  Prior to the hearing, Pye may submit a written application for clemency (which could have been submitted months ago after the denial of certiorari review) and at his clemency hearing, Pye's counsel will have the opportunity to present evidence in support of clemency. *See* Ga. Comp. R. & Regs. r. 475-3-.10(2)(b).  Finally,

"[i]f the Board's decision is to consider commutation and *sufficient time does not remain for the Board to conduct a complete and fair review of the case, the execution of the death sentence will be suspended* for a period of time not to exceed ninety days in order to allow time for such a review." *Id.* (emphasis added).

In sum, Pye has not alleged how he has been precluded from preparing for his clemency proceeding over the past year. Instead, he attempts to capitalize on an agreement under which he is not a party. Consequently, Pye has not sufficiently pled a claim for relief and his complaint should be dismissed.

## IV. Pye is not entitled to a temporary restraining order or a preliminary injunction.

A temporary restraining order or preliminary injunction is only appropriate when the moving party demonstrates that: (a) there is a substantial likelihood of success on the merits; (b) the restraining order or injunction is necessary to prevent irreparable injury; (c) the threatened injury outweighs the harm that the restraining order or injunction would cause to the non-movant; and (d) the restraining order or injunction would not be averse to the public interest. *See, e.g., Parker v. State Bd. of Pardons & Paroles*, 275 F.3d 1032, 1034-35 (11th Cir. 2001). Injunctive relief in either form "is an extraordinary and drastic remedy which should not be granted unless the movant clearly carries the burden of persuasion." *Canal Authority of Florida v. Callaway*, 489 F.2d 567, 573 (11th Cir. 1974). The burden of

persuasion as to all four requirements is on the movant. *See, e.g., United States v. Jefferson County*, 720 F. 2d 1511 (11th Cir. 1983).

The standards for granting injunctive relief are high. The Former Fifth Circuit, quoting Supreme Court precedent, noted that "[t]here is no power the exercise of which is more delicate, which requires greater caution, deliberation, and sound discretion, or more dangerous in a doubtful case, that the issuing of an injunction." *United States v. Harvey*, 250 F. Supp. 219, 229 (E.D. La. 1966). And the Eleventh Circuit has instructed its district courts to be even more tentative in issuing injunctions when, as here, the party to be enjoined is a state governmental entity. *See McKusick v. City of Melbourne, Fla.*, 96 F.3d 478, 487-88 (11th Cir. 1996) ("when, as in this case, [equitable remedies] are sought to be applied to officials of one sovereign by the courts of another, they can impair comity, the mutual respect of sovereigns – a legitimate interest even of such constrained sovereigns as the states and the federal government").

Pye cannot carry the extraordinary burden of making "a clear showing" that each preliminary injunction factor favors them for the relief sought. *Winder v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008).

### A.   Pye has not shown a substantial likelihood of success on the merits.

For all the reasons argued above that Pye has failed to state a claim of his equal protection and due process rights, he has failed to prove a likelihood of success on the merits of his claims.

### B.   Pye's has failed to show irreparable injury.

Pye's arguments for relief are premised on the allegation that he should be given more time to prepare for clemency and last-minute execution litigation.  Thus, the actual injury Pye is asserting he will suffer is limited time to prepare for his execution.  But Pye has not shown that he has not had adequate time to prepare for these known eventualities or that there is any law that affords him more time than he has been given.  He knew when his rehearing was denied he was not a party to the COVID-19 agreement, otherwise he would not have filed a motion to intervene the day before his execution warrant was signed.  There have been no death-eligible inmates since the Fulton County Court entered the injunction in May of 2021.  Pye's rehearing was denied nearly a year ago and his petition for certiorari was denied October 30, 2023, four months before his execution order was issued. There is no constitutional right to a clemency hearing, and as detailed above, the "minimal" due process safeguards afforded to clemency proceedings have been met by the State of Georgia. And the only law requiring notice to a death row inmate in Georgia of an execution is OCGA § 17-10-40(b), which only requires ten days' notice.

Because Pye has not even alleged that he has been prevented from preparing for his inevitable execution for at least the past year since his rehearing was denied, he has not shown he will suffer irreparable injury. *See Florida v. United States*, Nos. 23-11528, 23-11644, 2023 U.S. App. LEXIS 13863, at *9 (11th Cir. June 5, 2023) ("Indeed, 'simply showing some possibility of irreparable injury, fails to satisfy the second factor.'") (quotation marks omitted) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

### C.  Pye has not shown that the "threatened injury outweighs the harm that the restraining order" will cause.

Pye has also not shown that "the threatened injury outweighs the harm that the restraining order or injunction would cause to the non-movant." *Parker*, 275 F.3d at 1034-35. If the Court were to grant a stay based upon the grounds that Pye asserts, which are not supported in fact or law, then the State would not be able to obtain an execution warrant for any future death row inmates that become death eligible. Thus, even though the State would have an opinion by the Georgia Supreme Court stating these inmates are not a party to the COVID-19 agreement, a stay here on the grounds asserted by Pye, would constitute a contrary decision leaving the State without the ability to enforce its laws and death sentences. Pye's threatened injury of not having sufficient time to prepare for his execution (after approximately 25 years of litigation) is outweighed by the State's interest of enforcing lawful death sentences, to include Pye's.

**D.  A stay of execution is certainly contrary to the public interest.**

There are two public interests at stake here.  First "[b]oth the State and the victims of crime have an important interest in the timely enforcement of a sentence."  *Hill v. McDonough*, 547 U.S. 573, 584 (2006).  Even if this Court stays this action, the state courts may still never allow him to be a party to the COVID-19 agreement.  Pye gives no parameters for how the State could enforce his sentence if this occurs.  Pye's underlying argument in support of his constitutional claims turn on the timing of obtaining an execution warrant and in what order the State may seek execution warrants.   State law only requires 10 days' notice for an execution, if the federal courts instruct the state that more is required, then the public is left with conflicting law, which is not in its interest, and is contrary *Hill*.

 Also, in support of Defendants' first reason, "[a]court considering a stay must also apply a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay." *Hill*, 547 U. S. at 584 (internal quotation marks omitted).  Pye could have brought this action earlier without a need for a stay and he does not show otherwise.

Second, Pye asks this Court to find he is similarly situated to the inmates covered by the COVID-19 agreement, thus making him a party to the COVID-19 agreement.  That decision would be contrary to the state law. *See Federal Defender*, 315 Ga. 344 n.17.  It does not serve the public interest to have competing federal and state decisions.  Therefore, Pye has failed to

meet any of the requirements for a injunction or a temporary restraining order.

Accordingly, this Court should dismiss Pye's complaint and deny his request for a TRO and an injunction.

Respectfully submitted,

CHRISTOPHER M. CARR      112505
Attorney General

BETH BURTON               027500
Deputy Attorney General

_s/Sabrina D. Graham_      305755
SABRINA D. GRAHAM
Senior Assistant Attorney General

Please serve:
Sabrina D. Graham
Senior Assistant Attorney General
40 Capitol Square, S.W.
Atlanta, Georgia 30334-1300
sgraham@law.ga.gov
Telephone:  404-694-7975

**CERTIFICATE OF SERVICE AND TYPFACE**

I hereby certify that the foregoing pleading was formatted in Century Schoolbook 13 point, and that this day I have electronically filed this pleading with the Clerk of Court using the CM/ECF system which will automatically send e-mail notification of such filing to the following attorneys of record:

> Nathan Potek
> Federal Defender Program, Inc.
> 101 Marietta Street, Suite 1500
> Atlanta, Georgia 30303

This 13th day of March, 2024.

> s/*Sabrina D. Graham*
> Sabrina D. Graham
> Senior Assistant Attorney General